## IN RE JASON B.*
(AC 34226)

DiPentima, C. J., and Beach and Foti, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued May 30—officially released July 26, 2012**

** July 26, 2012, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Alison P. Gaston*, with whom, on the brief, was *Erich H. Gaston*, for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (petitioner).

*Kelly Babbitt*, for the minor child.

*Opinion*

FOTI, J. The respondent mother appeals from the judgment of the trial court rendered in favor of the petitioner, the commissioner of children and families, terminating her parental rights as to her minor child, Jason B. On appeal, the respondent[1] claims that the trial court improperly (1) drew an adverse inference against her, without first providing notice, on the basis of her failure to testify and (2) made certain factual findings. We affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our review of the present case. In 1994, when the respondent was sixteen, she gave birth to her first child. The respondent's relationship with that child's father ended after an incident of domestic violence. In 1997, the respondent gave birth to a second child. In 1999, the respondent married a second man. In 2000, the respondent gave birth to a third child. In 2004, after the deterioration of her marriage, the respondent began a relationship with a third man and again became pregnant. Approximately six and one-half months later, the respondent was injured during a domestic dispute and gave birth to a stillborn child.

In 2006, the respondent was sentenced to six months of imprisonment for criminal activities related to her

---

[1] The court also terminated the parental rights of the respondent father, but he has not appealed. We therefore refer in this opinion to the respondent mother as the respondent.

use of crack cocaine.[2] After the respondent was released from imprisonment, she received inpatient psychiatric treatment for bipolar disorder at Connecticut Valley Hospital. In 2007, the respondent received inpatient treatment for bipolar disorder at Natchaug Hospital and for drug addiction at the Stonington Institute. In 2008, the respondent participated in the Quinebaug Valley Extended Day Treatment Program but subsequently was discharged for noncompliance. In 2007, the respondent had become involved with a fourth man and, by the end of 2008, had given birth to Jason.

From May, 2009, to October, 2009, the respondent attended a substance abuse clinic and was under the care of Stephen Eldredge, a therapist. In March, 2010, the respondent relapsed. After returning to Eldredge's care for approximately five weeks, the respondent was referred to a higher level of care. On April 1, 2010, the petitioner filed a motion with the trial court seeking temporary custody of Jason. That motion was granted by the court, *Graziani, J.*[3] Jason subsequently was removed from the care of the respondent.

On April 15, 2010, the respondent entered the New Life Program, an inpatient substance abuse program

[2] In its memorandum of decision, the court noted that "[the respondent] has a criminal record dating back to 2003. The criminal charges are those commonly associated with substance abuse: threatening, reckless endangerment, disorderly conduct, multiple counts of larceny, burglary and probation violations."

[3] The court issued specific steps for reunification to the petitioner pursuant to General Statutes § 46b-129. The following steps are relevant to the present appeal: (1) "[t]ake part in counseling"; (2) "[a]ccept in-home support services"; (3) "[s]ubmit to a substance abuse evaluation and follow the recommendations about treatment, including inpatient treatment if necessary, aftercare and relapse prevention"; (4) "[s]ubmit to random drug testing"; (5) "[do] [n]ot use illegal drugs or abuse alcohol or medicine"; (6) "[c]ooperate with service providers"; (7) "[c]ooperate with court ordered evaluations or testing"; and (8) "[s]ign releases allowing [the department of children and families] to communicate with service providers . . . ."

located in Putnam. On April 28, 2010, following a nolo contendere plea from the respondent, the court adjudicated Jason to be neglected and committed him to the petitioner's care, custody and guardianship. The same day, Jason was returned to the care of the respondent by the petitioner in order to participate in the New Life Program.[4] On July 6, 2010, the respondent was discharged from the program for breach of her behavioral contract, and Jason was again removed from the respondent's care by the petitioner.

In August, 2010, the department of children and families (department) referred the respondent to the Natchaug Hospital Pathways Program. The respondent entered that program and was successfully discharged in September. The respondent's discharge summary from this program noted that her bipolar disorder was considered to be in full remission and that her addiction to cocaine was considered to be in early full remission.

The respondent failed to attend appointments at the Day Kimball Mental Health Center scheduled in September, 2010. On November 15, 2010, Kathy Flynn, an employee of Day Kimball Mental Health Center, stated that the respondent was at a high risk of relapse and recommended that she return to a higher level of care. An employee of the department discussed this recommendation with the respondent and recommended that she return to Natchaug Hospital. The respondent refused, however, to participate. On the same day, the respondent rescinded her releases of medical records. On December 1, 2010, the respondent refused to answer

---

[4] The department of children and families social worker assigned to the respondent and her family, Jennifer Torres, offered the following testimony at trial describing the New Life Program: "It's a mother-child program for mothers who are enduring substance abuse issues and . . . are in the path of recovery and . . . want to have their child. The child is able to be in the program as long as the child is committed and the mom can be in the program for up to a year and be successfully discharged into the community."

the door for a home visit despite acknowledging to the social worker that she was home. On December 3, 2010, the respondent failed to attend an appointment for a scheduled hair toxicology screen. Finally, the respondent did not attend scheduled visitations with Jason between November, 2010, and January, 2011.

On February 15, 2011, the petitioner moved to terminate the respondent's parental rights as to Jason. Following a trial, the court issued a memorandum of decision concluding that the petitioner had proved the following by clear and convincing evidence: (1) the department had made reasonable efforts to reunify Jason with the respondent, (2) the respondent had failed to achieve sufficient personal rehabilitation and (3) it was in Jason's best interest to terminate the respondent's parental rights. This appeal followed. Additional facts will be set forth below as necessary.

I

The respondent's first claim is that the court improperly drew an adverse inference against her, without first providing notice, based on her failure to testify. We disagree.

The following additional facts are necessary for the resolution of this claim. The court's memorandum of decision predicated its discussion of the evidence by stating that "[t]he *credible* evidence admitted at trial supports the following facts by clear and convincing evidence . . . ." (Emphasis added.) In the following paragraph, the court stated: "Since [the respondent] did not testify, there was no evidence presented to contradict the representations made in the [s]ocial [s]tudy . . . the [a]ddendum to the [s]ocial [s]tudy . . . or any of the exhibits offered by the [p]etitioner. The court accordingly places great weight upon those representations and accepts them as stated." (Citations omitted.) The court also noted that the respondent

"elected not to testify" and stated that "no adverse inference need be drawn." The court, at the respondent's request, issued an articulation clarifying whether its original memorandum of decision made an adverse inference against the respondent due to her failure to testify. In this articulation, the court stated that it "did not presume the evidence to be proven or presumed truthful or given 'particular' weight because the respondent did not testify. The court did accept the social studies 'as stated,' that is, uncontradicted, since no evidence was offered by the respondent to contradict them through the testimony of others or the offer of contradictory documentary evidence."

We begin our analysis of the respondent's claim by noting that the question of whether the court drew an adverse inference in the present case requires us to interpret the court's memorandum of decision. "The construction of a judgment is a question of law for the court, such that our review of the defendant's claim is plenary. As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Lehan* v. *Lehan*, 118 Conn. App. 685, 689, 985 A.2d 378 (2010).

The respondent is correct in her assertion that a court must inform a respondent if it intends to draw an adverse inference from his or her decision not to testify. See Practice Book § 35a-7A ("[i]f a party requests that the judicial authority draw an adverse inference from a parent's or guardian's failure to testify or the judicial authority intends to draw an adverse

inference, either at the start of any trial or after the close of the petitioner's case-in-chief, the judicial authority shall notify the parents or guardian that an adverse inference may be drawn from their failure to testify"). This court has stated previously, however, that "[s]uch notice is required only if a court is inclined to draw an adverse inference." *In re Lukas K.*, 120 Conn. App. 465, 475 n.4, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011). In the present case, the court stated explicitly at trial that it would draw no adverse inference from the respondent's decision not to testify. As this point is wholly undisputed, our analysis of the respondent's claim is limited to the question of whether such an inference was, nonetheless, drawn by the court in reaching its decision.

The respondent claims that the court's statement that "[s]ince [the respondent] did not testify, there was no evidence presented to contradict the representations made in the [s]ocial [s]tudy" indicates that the court drew an adverse inference based on her failure to testify. Although we agree that, when read in isolation, this statement may appear to be ambiguous, when read as a whole, the court's memorandum of decision clearly indicated that no adverse inference was drawn. Specifically, the court's memorandum of decision states that the respondent "elected not to testify and no adverse inference need be drawn." Moreover, in its articulation, the court noted that it did "not presume the evidence to be proven or presumed truthful . . . because the respondent did not testify."[5] When read in light of these

[5] The respondent claims that the court's articulation is inconsistent with its original memorandum of decision and that, as a result, this court must remand the matter for a new trial. Although we agree that such an inconsistency would require a new trial; see *Lusa* v. *Grunberg*, 101 Conn. App. 739, 743, 923 A.2d 795 (2007) ("An articulation is not an opportunity for a trial court to substitute a new decision nor to change the reasoning or basis of a prior decision. . . . If, on appeal, this court cannot reconcile an articulation with the original decision, a remand for a new trial is the appropriate remedy." [Citation omitted; internal quotation marks omitted.]); our conclu-

statements, it is clear that the evidence submitted by the petitioner was given "great weight" because it was found by the court to be both credible and wholly uncontested by the respondent. Such a conclusion represents an adverse finding by the court rather than an adverse inference. See Black's Law Dictionary (9th Ed. 2009) (an adverse inference is "[a] detrimental conclusion drawn by a fact-finder from a party's failure to produce evidence that is within the party's control"). We conclude that, reading the court's statements as a whole, an adverse inference was not imposed on the respondent because she elected not to testify at trial.[6]

## II

The respondent also claims that the court erred in making certain factual findings. Specifically, the respondent claims that the court erred in finding that: (1) the department made reasonable efforts to reunify the respondent with her child, (2) that the respondent failed to achieve sufficient personal rehabilitation and (3) termination of the respondent's parental rights was in the best interests of the child. We disagree.

We begin by setting forth relevant legal principles and the applicable standard of review. "The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the

sion that the court's original decision did not rest on an adverse inference forecloses the possibility that such an inconsistency exists.

[6] The respondent also claims that the court improperly shifted the burden of proof by crediting the evidence submitted by the petitioner simply because no evidence was presented by the respondent to the contrary. We disagree. The court's memorandum of decision specifically predicated its discussion of the evidence by stating that "[t]he *credible* evidence admitted at trial supports the following facts by clear and convincing evidence . . . ." (Emphasis added.) This statement indicates that the court gave weight to the evidence submitted by the petitioner, not because the respondent failed to contradict it, but because the court found it to be credible. Consequently, we conclude that this argument is without merit.

dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in [General Statutes] § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence. . . .

"It is axiomatic that a trial court's factual findings are accorded great deference. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . . Proof of one ground is sufficient to terminate parental rights." (Citation omitted; internal quotation marks omitted.) *In re Zowie N.*, 135 Conn. App. 470, 499–500, 41 A.3d 1056, cert. denied, 305 Conn. 916, 46 A.3d 170 (2012).

A

The respondent claims that the court's conclusion that the department made reasonable efforts to reunify her with her child was clearly erroneous. Specifically, the respondent argues that the department should have referred her to additional substance abuse programs and provided her with additional mental heath treatment. The petitioner responds by arguing that the evidence contained within the record does not indicate

that additional services would have been beneficial and that, even if the record contained such evidence, it would not render the court's finding of reasonable efforts clearly erroneous. We agree with the petitioner.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification. . . . [Section 17a-112 (j)] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 144–45, 962 A.2d 81 (2009).

Here, the respondent received treatment from Connecticut Valley Hospital, Quinebaug Valley Extended Day Treatment Program, Stephen Eldredge, the New Life Program, the Pathways Program and Day Kimball Mental Health Center since 2007. The petitioner moved to terminate the respondent's parental rights only after she had rescinded the releases of her medical records, failed to participate in scheduled drug screenings, refused to allow home visits and declined the department's invitation to return to inpatient treatment. Moreover, as noted by the court in its memorandum of decision, "[the respondent's] visits with Jason [had] steeply declined." Given the presence of these facts in the record, we conclude that the court's finding that

the department made reasonable efforts to reunite the respondent with her child was not clearly erroneous.[7]

B

The respondent claims that the court's finding that she has failed to achieve sufficient personal rehabilitation is clearly erroneous. In support of this claim, the respondent argues that the court's reliance on evidence of a relapse into substance abuse does not, by itself, support the court's finding that she has failed to achieve rehabilitation.[8] The petitioner responds by arguing that the record contains evidence indicating that the respondent had relapsed and continued to "struggle in all the areas of concern that had led to removal" and that, therefore, the court's finding that she had failed to achieve personal rehabilitation was not clearly erroneous. We agree with the petitioner.

The following additional facts are relevant to our resolution of the respondent's claim. On September 12, 2011, the respondent was referred to the Quinebaug Day

---

[7] Having reached this conclusion, we need not reach the respondent's claim that the court improperly concluded that she was unable or unwilling to benefit from reunification efforts. See *In re Anvahnay S.*, 128 Conn. App. 186, 191, 16 A.3d 1244 (2011) ("because we conclude that the court properly found, on the basis of clear and convincing evidence, that the department had made reasonable efforts to reunify the respondent and [the child], we do not reach his claim that the court improperly concluded that he was unable or unwilling to benefit from reunification efforts").

[8] The respondent also argues that the court could not have concluded that she failed to achieve rehabilitation because the department failed to refer her to services in response to a report from Mary H. Cheyne, a clinical psychologist, dated November 28, 2010. Specifically, the respondent notes that the report recommended that the respondent complete a substance abuse program and seek additional treatment for bipolar disorder. Having reviewed the record, we find no merit to this argument. The respondent has been enrolled in community based programs and has been admitted to hospitals on multiple occasions to address these same issues since 2006. Moreover, in November, 2010, the same month Cheyne issued her report, the respondent declined the department's referral for additional inpatient treatment at Natchaug Hospital.

Treatment Program at Natchaug Hospital. The discharge summary from this stay, dated October 3, 2011, contains the following information: "Patient is [a thirty-four year old] Caucasian woman disabled, collecting disability [and] referred for treatment by [p]ublic [d]efender. Patient said, 'I had suicidal attempt [three] weeks ago. I was drinking alcohol, taking some pills and using crack. I did not want to live anymore because of my reputation, relationship and financial problems.' " The summary continues, "[l]egal [matters] pending for [twelve] counts of burglary and larceny." The summary further indicates that toxicology tests had been completed and the results were "positive for cocaine and cannabis." In an articulation dated January 10, 2012, the court noted that it gave "particular attention" to this document.

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parents'] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [that the parents have] achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [they] can assume a responsible position in [their] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. . . . As part of the analysis, the trial court must obtain a historical perspective of the respondent's child caring and parenting abilities, which includes prior adjudications of

neglect, substance abuse and criminal activity." (Internal quotation marks omitted.) *In re Christopher L.*, 135 Conn. App. 232, 245, 41 A.3d 664 (2012).

In the present case, the court noted explicitly that the respondent had tested positive for cocaine use only a few months before trial and had engaged in criminal activity. Moreover, as noted previously, the evidence contained in the record indicates that the respondent had declined inpatient treatment and had ceased cooperating with the department in relation to home visits, medical records and scheduled drug testing. In light of these facts, we conclude that the court's finding that the respondent had failed to achieve a level of rehabilitation that would encourage the belief that, within a reasonable time, considering the child's age and needs, she could assume a responsible position in the life of her child, was not clearly erroneous.[9]

C

The respondent's final argument is that the court discounted certain evidence that Jason had bonded with her, and, therefore, its finding that termination of her parental rights was in the best interest of the child was clearly erroneous. The petitioner responds by arguing that the court properly considered the child's bond with

[9] The respondent cites various Superior Court cases that conclude that the department failed to prove the absence of rehabilitation by clear and convincing evidence despite the parent's ongoing substance abuse problems. E.g., *In re Jaheim P.*, Superior Court, judicial district of New London, Docket No. K-09-CP010433A, 2007 Conn. Super. LEXIS 2822 (October 3, 2007). The respondent argues that such cases support the conclusion that "[her] struggle with drug use standing alone does not support termination of her parental rights on lack of rehabilitation grounds." While the respondent's relapse may well have been weighed differently by the trial court, this court's review of the respondent's claim is limited to whether the court's conclusion that she failed to achieve rehabilitation was clearly erroneous. See *In re Zowie N.*, supra, 135 Conn. App. 499–506. Moreover, as noted previously, the record contains additional evidence that supports the trial court's conclusion that the respondent failed to achieve rehabilitation.

his foster parents and his need for permanency and therefore properly reached the conclusion that it did. We agree with the petitioner.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interests of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [General Statutes § 17a-112 (k)]."[10] (Internal quotation marks omitted.) *In re Albert M.*, 124 Conn. App. 561, 566, 6 A.3d 815, cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010). "The seven factors serve simply

---

[10] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Alison M.,* 127 Conn. App. 197, 211, 15 A.3d 194 (2011).

Here, the court made the following explicit findings of fact in relation to the factors enumerated in § 17a-112 (k): (1) the respondent was provided with "timely and appropriate services"; (2) the department made "reasonable efforts to reunite the family"; (3) the respondent had "violated a number of court orders pertinent to the specific steps"; (4) Jason "had a bond with [the respondent] until she stopped her regular visits" but has "fully integrated" with his foster family; (5) Jason was three years of age; (6) the respondent had failed to make "realistic and sustained efforts to conform her conduct to even minimally acceptable parental standards" regarding her addiction to illegal substances; and (7) the respondent was not prevented from maintaining a relationship with Jason by financial circumstances or by unreasonable conduct by third parties. In light of these factual findings, the court concluded that termination of the respondent's parental rights was in the best interests of the child.

The respondent contends that the court erroneously concluded in its discussion of the fourth factor that she no longer has a bond with Jason. In support of this argument, the respondent cites a report authored by Mary H. Cheyne, a clinical psychologist, on November 28, 2010. This report states that, during visitation, Jason "ran to [the respondent] when he identified her" and that the respondent "was very appropriate and bonded with her son and he was obviously attached to her." Jennifer Torres, the social worker assigned to the respondent and her family, testified at trial, however, that the bond between the respondent and her son

broke down after the report cited by the respondent. Specifically, Torres testified at trial that "[the respondent] did not call, did not show up for visits from about November [2010] to January of 2011" and that while "visits were consistent, Jason had a bond with [the respondent] but because of the time, you know, not showing up to visits, not seeing Jason for three months at a time, Jason doesn't really know who [the respondent] is and thinks she's a stranger and doesn't have that bond that they had initially." Given this decline in the respondent's visits with Jason and the court's explicit conclusion that Jason had bonded well with his new foster family, we conclude that the trial court did not err in finding that the fourth factor enumerated in § 17a-112 (k) favored the petitioner. Accordingly, we conclude that the trial court's finding that termination of the respondent's parental rights was in the best interest of the child was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.