******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE JAMES O., JR., ET AL.*
(AC 37739)

Prescott, Mullins and West, Js.

*Argued September 8—officially released October 9, 2015***

(Appeal from Superior Court, judicial district of
Middlesex, Child Protection Session, Elgo, J.)

*David J. Reich*, for the appellant (respondent

mother).

*Frank H. LaMonaca*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Linda K. Herzner*, for the minor children.

*Opinion*

PRESCOTT, J. The respondent mother, Marjorie H., appeals from the judgments of the trial court rendered in favor of petitioner, the Commissioner of Children and Families, terminating her parental rights as to her son, James O., Jr., and her daughter, Jolene O.[1] The respondent claims that the court improperly (1) compared the relative abilities of the respondent and the children's foster mother's to parent the respondent's children in determining whether the respondent had failed to rehabilitate herself sufficiently; (2) found that the Department of Children and Families (department) made reasonable efforts to reunify the respondent with her children; and (3) admitted evidence under the hearsay exception for statements made for the purpose of obtaining medical treatment. We affirm the judgments of the trial court.

The following facts, as found by the trial court or as are undisputed in the record, and procedural history are relevant. The respondent's involvement with the department originated with a series of referrals to the department. In March, 2004, a referral was made to the department on the basis of an allegation of physical neglect of James, Jr. In September, 2008, a referral was made to the department after the father, James O., Sr., was charged with operating a motor vehicle under the influence. Not only had the father been intoxicated, but he also had a bloody nose and swollen right eye, and the rear window of his motor vehicle was broken. According to the father, the respondent had hit him and smashed the rear window of the family car.

In September, 2010, James, Jr.'s school made a referral to the department after James, Jr., came to school with a bruised right cheek. That October, James, Jr., who was seven years old at the time, was taken to a hospital after attempting suicide by jumping off monkey bars at school. The department investigated the incident but closed the case after the respondent agreed to accept services from Intensive In-Home Child and Adolescent Psychiatric Services. The respondent did not follow through on the agreement.

By April, 2011, James, Jr.'s school psychologist had made four referrals to the department, reporting that James, Jr., exhibited extreme behaviors and that both of the respondent's children had missed more than forty days of school. Another referral to the department was made on May 18, 2011, concerning educational neglect of both children and medical neglect of James, Jr., by the respondent. James, Jr., had told school staff that "he wanted to split his skull open like a watermelon," that he did not know how to stop hurting himself, and that he heard voices and wanted to kill himself. The Behavioral Health Center of Waterbury Hospital recommended that James, Jr., be psychiatrically admitted, but

the respondent refused.

On the basis of the school's referrals, the department conducted a home visit on June 8, 2011. The respondent did not answer the social worker's questions and claimed that she had officially withdrawn her children from school. On June 9, 2011, the department filed neglect petitions, alleging that the children were exposed to substance abuse and domestic violence, that James, Jr., had serious mental health issues, that the parents had failed to provide recommended services to the children, and that the children had been withdrawn from school.

On the basis of the allegations of neglect contained in the petition, the department also sought and received orders of temporary custody for the children on June 9, 2011.[2] Upon first being removed from the respondent's custody, both children were placed in foster homes; however, because of James, Jr.'s mental health issues, he was subsequently hospitalized at Danbury Hospital and then later at Yale-New Haven Hospital. In her foster placement, Jolene demonstrated sexualized behavior, including constant masturbation, talk about sex, and inappropriate sexual activities, causing the foster parent to question whether there was a history of sexual abuse.

On June 23, 2011, prior to the hearing on the order of temporary custody, the respondent entered into an agreement with the department to dissolve the order of temporary custody as to Jolene. Pursuant to the agreement, James, Jr., was to remain in the department's custody and was to continue to be hospitalized at Yale-New Haven Hospital. As a condition of dissolving the order of temporary custody as to Jolene, the respondent was required to take Jolene to therapy. On June 24, 2011, at the first scheduled therapy appointment, Jolene disclosed that she had been physically and sexually abused by her father. In response to these statements, the department again removed Jolene from the respondent's custody and sought a placement for both children at Safe Home, a short-term care facility providing clinical services.

While at Safe Home, the staff noted James, Jr.'s suicidal thoughts, tendencies to fixate, high anxiety, and fragile emotional state, as well as Jolene's sexual actions, animal-like behaviors, such as walking on all fours, aggression, and skewed sense of reality. Safe Home described Jolene "as one of the most traumatized children they have seen." The children's behavior at Safe Home led the department to realize that the children needed a caregiver who could understand and appropriately manage these behaviors and that more intensive therapeutic support was necessary. In October, 2011, the department placed the children in a therapeutic foster home with Paula M., a licensed therapeutic foster care provider.

The trial on the neglect petitions was conducted on March 22, 27, and 28, 2012. The respondent entered pleas of nolo contendere on June 19, 2012. The court adjudicated the children neglected and committed them to the department's custody. The respondent, who was represented by counsel at the time, agreed to specific steps, which the court subsequently approved, to facilitate the respondent's reunification with James, Jr., and Jolene.

The specific steps, in relevant part, required the respondent to cooperate in individual counseling and parenting education, to "[a]cknowledge and take responsibility for any past anger, domestic violence and/or controlling behavior (whether as perpetrator or victim)"; to "[a]cknowledge the responsibility you have, if any, in the removal of your children"; to "[d]evelop insight into why your children are no longer in your care;" to "[a]ddress issues related to poor boundaries and sexualized behavior and the impact that it has had on each member of your family. . . . Explore and come to thoroughly understand why a perpetrator of abuse is totally responsible for the abuse . . . . Learn how to set and maintain appropriate boundaries when interacting with children who have alleged and/or experienced sexual abuse"; and to "[e]ngage in counseling to increase your understanding of your chronic resentment and anger and improve your communication . . . ."

After commitment to the department's custody on June 19, 2012, Jolene began trauma-focused cognitive behavioral therapy (behavioral therapy) treatment. Throughout her treatment, Jolene consistently alleged that "she was physically abused by her father, sexually abused by both parents, and witnessed domestic violence between her parents." In contrast, James, Jr., had difficulty talking about his trauma history, especially the alleged sexual abuse, becoming anxious and tearful whenever that subject was broached. James, Jr., has been diagnosed with post-traumatic stress disorder and autism.

To aid the respondent in fulfilling the court-ordered specific steps, the department contracted with All Pointe Care, LLC, to provide an hour of parent education to the respondent over the telephone every week prior to the respondent's scheduled visits with her children. In addition to parent education, the department provided the respondent with supervised visitation with her children for two hours every week. The department also provided the respondent with transportation and/or mileage reimbursement to and from every visitation.

The department also made multiple referrals on behalf of the respondent in order to help her meet the requirements of the specific steps, including a referral to the McCall Foundation for a substance abuse evalua-

tion and a referral to the Wellspring Foundation for individual therapy. The department also provided both of the respondent's therapists with a copy of the court-ordered specific steps. The department provided either transportation or mileage reimbursements to and from therapy, and went as far as to pay for repairs to the respondent's truck.

The department encouraged the respondent to contact and communicate with the children's school, therapists, and providers. The only therapist that the respondent was not allowed to contact was the Child Abuse Treatment Services Program therapist, who worked with Jolene, because a condition in the program's grant funding would not allow perpetrators of trauma or caregivers who would not acknowledge the source of the child's trauma to participate in the program. The respondent was permitted and encouraged to contact Jolene's outpatient therapist, all of James, Jr.'s therapists, the children's school, and the children's physicians.

On April 24, 2013, the department petitioned the court, pursuant to General Statutes § 17a-112 (j) (3) (B) (ii), to terminate the respondent's parental rights on the ground that she had failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and particular needs of her children, she could assume a responsible position in their lives. A trial on the termination of parental rights petitions was conducted over a span of eleven days between January 22 and May 23, 2014, with posttrial briefs filed on July 16, 2014.

On November 13, 2014, the court terminated the respondent's parental rights. The court found by clear and convincing evidence that the department had made reasonable efforts to reunify the respondent with James, Jr., and Jolene, that the respondent had been unwilling or unable to benefit sufficiently from the department's services, and that the respondent had failed to rehabilitate. The court determined that the respondent had "failed to acknowledge responsibility for the conditions leading to the children's removal . . . ." The court found it particularly troubling that the respondent has "seriously discounted and/or not acknowledged the extent to which domestic violence and substance abuse have been a significant source of trauma to [her] children. Having focused exclusively on the allegations of sexual abuse, the [respondent has] failed to acknowledge the degree to which [her] children presented with profoundly disturbing behaviors, which has not been credibly disputed."

This appeal followed. Additional facts will be set forth as necessary.

I

The respondent first claims that, in reaching its con-

clusion that she had failed to achieve a sufficient degree of personal rehabilitation as required under § 17a-112 (j) (3) (B) (ii), the court improperly compared her abilities to parent her children with those of the children's therapeutic foster mother, Paula M. The respondent argues that the court's reliance on a comparison of the respondent's and Paula M.'s relative parenting skills in resolving an aspect of the adjudicatory portion of the termination proceedings was improper because, in so doing, the court prematurely focused its analysis on the best interest of the children rather than limiting its inquiry to whether clear and convincing evidence existed that the respondent had failed to rehabilitate.

The department argues that the respondent's claim fails because that portion of the court's decision regarding the respondent's failure to rehabilitate, read as a whole, demonstrates that the court properly considered the specific needs of the respondent's children in assessing the adequacy of her rehabilitation, and that any reference by the court to the children's current placement was meant to be illustrative of the level of care necessary to continue the children's therapeutic progress. We are persuaded by the petitioner's argument and, accordingly, reject the respondent's claim.

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B)." *In re Shane M.*, 318 Conn. 569, 587–88, A.3d (2015). To the extent that the respondent claims that the court in the present case impermissibly considered factors that fell outside the scope of that inquiry, the respondent raises a legal issue that requires us to interpret the judgments of the court as set forth in its memorandum of decision. Accordingly, we employ a plenary standard of review. See *In re Jason B.*, 137 Conn. App. 408, 414, 48 A.3d 676 (2012).

"A hearing on a termination of parental rights petition consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the court must determine whether the commissioner has proven, by clear and convincing evidence, a proper ground for termination of parental rights. . . . In the dispositional phase, once a ground for termination has been proven, the court must determine whether termination is in the best interest of the child." (Citations omitted.) *In re Vincent D.*, 65 Conn. App. 658, 664–65, 783 A.2d 534 (2001). Although Practice Book § 35a-7 (b) expressly provides that the court, in its discretion, may hear evidence pertaining to both adjudication and disposition "in a nonbifurcated hearing," the rule further provides that "disposition may not be considered until the adjudicatory phase has concluded."

As our Supreme Court has cautioned, "[p]etitions for termination of parental rights are particularly vulnera-

ble to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria [governing the adjudication of parental rights]." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672–73, 420 A.2d 875 (1979).

It is axiomatic that "[t]ermination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . [P]arents retain a vital interest in preventing the irretrievable destruction of their family life. . . . It bears emphasis that a judicial termination of parental rights may not be premised on a determination that it would be in the child's best interests to terminate the parent's rights in order to substitute another, more suitable set of adoptive parents. Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence. . . . [A] parent cannot be displaced because someone else could do a better job of raising the child. . . . Although, as a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination of parental rights . . . [i]nsistence upon strict compliance with the statutory criteria before termination . . . can occur is not inconsistent with concern for the best interests of the child. . . . A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Baby Girl B.*, 224 Conn. 263, 279–81, 618 A.2d 1 (1992); see also *In re Juvenile Appeal (Anonymous)*, supra, 177 Conn. 673 ("[t]he best interests of the child . . . is not an ingredient of [grounds for termination]" [internal quotation marks omitted]).

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status *as it relates to the needs of the particular child*, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in

[his or her] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for *the particular needs of the child at issue*." (Citation omitted; emphasis added; internal quotation marks omitted.) *In re Sheila J.*, 62 Conn. App. 470, 480, 771 A.2d 244 (2001).

In the present case, the court found that the petitioner met her burden of showing by clear and convincing evidence that the respondent had failed to achieve the necessary level of rehabilitation, given the age and needs of the children. The court began its analysis by discussing the special needs of the respondent's children. The court found that from the time that the children first entered foster care they were "seriously disturbed" and that "their home environment was responsible for their condition . . . ." The court found that James, Jr., had made disturbing statements that included harming other children, and that Jolene exhibited intense sexual reactivity, which manifested itself in frequent public masturbation and inappropriate touching of her brother. The court also found that Jolene suffered from exaggerated startle responses, hypervigilance, excessive animal-like behaviors, and aggression. Jolene also had difficulty focusing and concentrating in school.

The court also found that the children's disclosures of sexual abuse to their therapists and to Paula M. were reliable, especially given that the children understood the role that these people played in their recovery and in keeping them safe.[3] The court indicated that the testimony of the children's therapists, which the court found credible, persuasive and reliable, made it clear that the children needed a caregiver who could utilize the therapeutic approaches established in therapy and that such care was key to the children healing from and addressing their past trauma. Having determined that the children had significant and special needs, the court turned to whether the respondent had demonstrated a sufficient level of rehabilitation to care for those needs and to assume a responsible position in the children's lives. The court stated that "[e]ven in the absence of sexual abuse disclosures, the children's behaviors alone, and the [respondent's] utter failure to acknowledge and appreciate the significance of these behaviors, are, in and of themselves, an enormous impediment to reunification."

It is at this point in the court's analysis that the respondent claims that the court improperly compared the relative parenting abilities of the respondent and Paula M. In particular, the respondent points to the following language from the court's decision: "More important than the disclosures, however, is the clear and convincing evidence that the children have made

extraordinary progress while living with Paula M., in an environment that is calm and understanding of the children's needs. As both therapists have made clear, the children have needed a caregiver who is calm, patient, able to set appropriate limits, willing to participate intensively in the children's therapy, and able to help the children with coping skills to manage their anxiety. The children have also needed someone who would believe their statements about the source of their trauma. [One of the therapists] credibly testified that the behavioral therapy model requires that a child be understood and treated in the context of their living environment. As the children's progress, relationship and work with Paula M. makes clear, the process of healing and recovery must also occur in a home environment which the children have come to learn is safe and caring. Given Paula M.'s training and participation in therapy sessions, it is clear that this process cannot be limited to the one hour per week session that a child has, even with a trusting therapist. In contrast, [the respondent] is volatile and prone to violence, unable to set appropriate limits, unwilling to talk with the children's therapists and, therefore, unable to help them use coping skills to manage their anxiety and ultimately, unwilling to believe the children's statements regarding the trauma. In short, [the respondent] has none of the qualities the children have required to stabilize and to continue to heal from the traumas they experienced while in [her] care."

We agree that, as a general proposition, courts should refrain from discussing the relative advantages, material or otherwise, that a child might receive as a result of his or her current or future placement as compared to the respondent parent in resolving the adjudicatory portion of a termination of parental rights petition. This is because such comparisons are likely to be construed, as the respondent does here, as an improper comparison between a parent and a preadoptive foster parent or other guardian. We nevertheless are convinced from our review of the court's findings and analysis in the present case that, when read in context, the court properly reached its decision that the respondent had failed adequately to rehabilitate by considering only those factors relevant to the respondent's rehabilitative status as it relates to the particular needs of the respondent's children.

We construe the language relied on by the respondent, not as making a direct comparison between the respondent and Paula M., so much as clarifying that the children needed and continue to need an environment that is calm, in which their needs are understood, and in which their caregiver can manage their anxiety in an appropriate manner. Although the court did indicate that the level of care that they were receiving from Paula M. met this criteria, the court never stated at this point of the analysis (or at any other time) that it would

be in the children's best interest to remain with Paula M. Rather than prematurely considering disposition, as is suggested by the respondent's argument, the court maintained its focus squarely upon the respondent, her rehabilitation, and the particular needs of the children, ultimately determining that the respondent would be unable to meet the children's particular needs because of her failure to rehabilitate.[4] In sum, we reject the respondent's claims that the court improperly compared her parenting abilities with those of Paula M. in reaching its conclusion that she failed to achieve a sufficient degree of personal rehabilitation as required under § 17a-112 (j) (3) (B) (ii).

## II

The respondent next claims that the court improperly concluded that the petitioner proved by clear and convincing evidence that the department had made reasonable efforts to reunify her with James, Jr., and Jolene.[5] Specifically, the respondent claims that the department's "efforts were not reasonable because they were based on an inaccurate assessment" of domestic violence and sexual assault. We are not persuaded.

"To terminate parental rights under [§ 17a-112 (j) (1)] the department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with [§ 17a-112 (j) (1)], the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate." (Internal quotation marks omitted.) *In re Gabriella A.*, 154 Conn. App. 177, 181, 104 A.3d 805 (2014), cert. granted on other grounds, 315 Conn. 914, 106 A.3d 306 (2015).

" 'The reasonableness of the department's efforts must be assessed in the context of each case. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case.' . . . *In re Kyara H.*, 147 Conn. App. 855, 872–73, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014)." *In re Gabriella A.*, supra, 154 Conn. App. 182–83.

Our Supreme Court recently clarified the standard

of review that we apply with respect to a trial court's conclusion that a parent has failed to rehabilitate pursuant to § 17a-112 (j) (3) (B), stating that only the court's subordinate factual findings are reviewed for clear error. *In re Shane M.*, supra, 318 Conn. 587–88. The court in *In re Shane M.* made clear that the ultimate conclusion of whether a parent has failed to rehabilitate "is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the [reasonable efforts] ground set forth in § 17a-112 (j) (3) (B). Accordingly, we now [determine] that the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; internal quotation marks omitted.) Id.

Although this recent clarification of the standard of review was made with respect to § 17a-112 (j) (3) (B), not to § 17a-112 (j) (1), it is logical that the same standard should apply with respect to § 17a-112 (j) (1) because the trial court is being asked to draw a similar legal conclusion on the basis of the underlying facts. Thus, we review the trial court's subordinate factual findings for clear error, but we review the court's ultimate conclusion that the department made reasonable efforts to reunify the child with the parent on the basis of whether the cumulative effect of the evidence was sufficient to justify the ultimate conclusion.

The trial court, in its memorandum of decision, recounted the various efforts made by the department regarding reunification. In its findings of facts, the court found that the department provided the respondent with individual therapy, parent education, visitation services, transportation, and mileage reimbursement. The department also ensured that the respondent had access to the children's school, therapists, physicians, and other providers, if possible. On the basis of these subordinate findings, the court reached the ultimate conclusion that the department had made reasonable efforts to reunify the respondent with her children.

The respondent does not dispute that she was provided any of the previously described services, nor does she claim that she should have been provided some additional service. The court's findings as to the services provided are supported by the testimony and evidence in the record, and, therefore, are not clearly erroneous.

Although she acknowledges that she was provided with these services, the respondent nevertheless argues that the department's efforts at reunification were not

reasonable "[b]ased on [the department's] firm belief that [the respondent] had sexually assaulted [her] children and [the respondent's] denial of those allegations, [so that] the department would not seriously move forward with reunification." None of the provided services, as described previously, required the respondent to admit to sexually abusing her children. Attending individual therapy and parent education sessions did not require such an admission. Receiving transportation and mileage reimbursement to and from therapy and visitations did not require such an admission. Being encouraged to communicate with the children's providers and school did not require such an admission. Even if the department believed the respondent to be a perpetrator of sexual abuse, that belief never hindered the department's provision of these services to her, nor did it make these provided services unreasonable or insufficient.

The respondent is correct that she could not contact or participate in the Child Abuse Treatment Services Program, which provided therapy to Jolene, as long as the respondent did not acknowledge the source of the children's trauma or was believed to be a perpetrator of the trauma. Thus, there was one service to which the respondent was not allowed access because of the department's belief that the respondent had sexually abused her children. The court, however, found credible testimony that the respondent was allowed, and was encouraged, to contact all of Jolene's other therapists, as well as both children's schools, physicians, and providers. Consequently, the department offered the respondent access to a number of alternative services of treatment and therapy, of which she failed to avail herself. Thus, the respondent's lack of participation in the Child Abuse Treatment Services Program did not make the department's reunification efforts unreasonable.

The respondent also appears to argue that the court-ordered specific steps, which the department's efforts and services are meant to address, themselves require the respondent to admit to sexually abusing her children, and, therefore, any of the department's efforts to address these steps were per se unreasonable. First, at no point did the respondent object to these specific steps or ask for them to be modified. The specific steps were court-ordered and agreed to by the respondent, who was represented by counsel at the time. Second, the court made no factual findings as to whether the specific steps required the respondent to admit to participating in sexually abusing her children, and the respondent did not request an articulation on this issue. The court did state, in its memorandum of decision, that it credited the testimony of Jennifer Birden, a department social worker, who testified at trial that the respondent need not admit that she sexually abused her children but, rather, "[i]f you look at the goal as a

whole, part of that is talking about the appropriate boundaries for children who have alleged or experienced sexual abuse. Not talking specifically about who perpetrated that, but understanding that those kids have disclosed this and then how to relate to them." The purpose of these specific steps was to "[focus] on the needs of her children . . . ." The respondent did not need to admit to sexual abuse; rather, she was required to come to an "understanding that the children made these disclosures, and [an] understanding [of] how to assist them moving forward, how to cope with the symptoms, whether it be through therapy, or how to handle a child who's disclosed sexual abuse." Birden did admit at trial that one way of satisfying some of the specific steps would be for the respondent to admit to participating in sexually abusing her children, but her other testimony made it clear that this was not the only way to satisfy those specific steps.

In conclusion, the record supports the court's factual findings concerning the services the department provided to the respondent. On the basis of these findings and the reasonable inferences drawn therefrom, the court reasonably could have concluded that the cumulative effect of the evidence was sufficient to justify its ultimate conclusion that the department had made reasonable efforts to reunify the respondent with her children. Accordingly, we reject the respondent's claim that the court improperly concluded that the department made reasonable efforts to reunify the respondent with her children.

### III

Finally, the respondent claims that the trial court abused its discretion by admitting into evidence two exhibits that contained hearsay statements of the children. In particular, the respondent argues that the court improperly concluded that the children's statements were made for the purpose of obtaining medical diagnosis or treatment and, thus, were admissible pursuant to the medical treatment exception to the hearsay rule. See Conn. Code Evid. § 8-3 (5). We conclude that even if we assume, without deciding, that the respondent is correct and that the exhibits in question were improperly admitted into evidence, the respondent has failed adequately to brief how she was harmed by the erroneous admission. Because the respondent has failed to brief the issue of harmfulness, we deem the claim abandoned and, accordingly, decline to review it. See *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 829, 95 A.3d 1063 (2014).

The following additional facts and procedural history are relevant to our discussion. On January 30, 2014, during the direct examination of the children's therapeutic foster mother, Paula M., the petitioner offered into evidence exhibit 16 and exhibit 24, each of which contained out-of-court statements by the respondent's

children that tended to corroborate that the children were the victims of sexual abuse. Specifically, exhibit 16 was a typewritten transcription, prepared by Paula M., of a recounting by James, Jr., of inappropriate touching of a sexual nature between his family members. According to Paula M., James, Jr., had requested that she write down his troubling thoughts, which was one of several coping mechanism that he had learned during therapy sessions. Exhibit 24 was a single sheet of paper that Jolene had obtained from Paula M. while the two attended a Bible study class and on which Jolene had made several small drawings. The document also contained some words that Jolene had written contemporaneously with her having made the drawings. The respondent objected to the admission of both exhibits on the ground that the children's out-of-court statements were hearsay that did not fall within the medical treatment exception as advanced by the petitioner and because they lacked any other real indicia of reliability. The court deferred ruling on the admissibility of the evidence, permitting the parties to brief the issue. The court held a hearing on February 10, 2014, following which it ruled that the children's statements were admissible under both the medical treatment and residual exceptions to the hearsay rule.

"It is well settled that, absent structural error, the mere fact that a trial court rendered an improper ruling does not entitle the party challenging that ruling to obtain a new trial. An improper ruling must also be harmful to justify such relief. . . . The harmfulness of an improper ruling is material irrespective of whether the ruling is subject to review under an abuse of discretion standard or a plenary review standard. . . . When the ruling at issue is not of constitutional dimensions, the party challenging the ruling bears the burden of proving harm." (Citations omitted; internal quotation marks omitted.) Id., 824–25; see also *In re Amneris P.*, 66 Conn. App. 377, 382, 784 A.2d 457 (2001) (respondent parent challenging admissibility of evidence had burden of demonstrating harmful error).

In the present case, beyond summarily concluding that the court's decision to admit the two exhibits was harmful, the respondent has failed to address the issue. The respondent has the burden of demonstrating that the court's improper ruling likely affected the outcome of the trial. "[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Saint Bernard School of Montville, Inc.* v. *Bank of America*, supra, 312 Conn. 829. Because the respondent has failed to address harmfulness adequately, we deem her evidentiary claim abandoned.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** October 9, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] James, Jr., was born in August, 2003, and Jolene was born in August, 2004. We also note that the court terminated the parental rights of the children's father, James O., Sr., in the same proceeding, but he is not a party to this appeal. We therefore refer to the respondent mother as the respondent in this opinion.

[2] When the children were first removed, James, Jr., was seven and Jolene was six years old.

[3] The court also credited the testimony of one of the therapists who indicated that children do not lie about their emotional and physiological symptoms.

[4] To the extent that the language used by the court is open to different interpretations, and thus is ambiguous, absent an articulation, which the respondent never sought, we will presume the court applied the correct legal standard in reaching its decision. See *In re Jason R.*, 306 Conn. 438, 456, 51 A.3d 334 (2012).

[5] The respondent also claims that the court improperly concluded that she was unwilling and/or unable to benefit from reunification efforts. Because we conclude that the court properly determined that the department made reasonable efforts to reunify, we need not address this additional claim of error. See *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).